FILED
JUL - 5 2006
CLERK, US DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

**JERRY DORAN,**

**Plaintiff,**

**v.**

**DEL TACO, INC. dba DEL TACO #415; PACIFIC CASTLE INTERNATIONAL, LLC,**

**Defendants.**

**CASE NO. SACV 04-046 CJC (ANx)**

**MEMORANDUM OF DECISION**

DOCKETED ON CM
JUL - 5 2006
BY 024

## I. INTRODUCTION

This memorandum constitutes the Court's final decision with respect to the bench trial it conducted involving Plaintiff Jerry Doran, a wheelchair bound advocate for the disabled, and Defendant Del Taco, Inc., a successful fast food Mexican restaurant chain.[1] By his own admission, Mr. Doran is a litigious

---

[1]Mr. Doran also named Pacific Castle International, LLC, as a Defendant in this case. Pacific Castle International, LLC, owns the property on which the Del Taco restaurant is located. The Court will refer to both Defendants collectively as "Del Taco."

advocate. He has filed over two hundred disability access lawsuits in federal and state courts throughout California. In this lawsuit, Mr. Doran alleges that he was denied full access and enjoyment of a Del Taco restaurant in Mission Viejo, California due to various architectural barriers. His allegations against Del Taco are virtually identical to those he has asserted against other defendants in his hundreds of other disability access lawsuits.

In order to prevail on his disability access claims against Del Taco, Mr. Doran had to convince the Court that he actually visited the Del Taco restaurant in Mission Viejo and encountered architectural barriers there prior to the date that he filed his complaint. Mr. Doran has not been successful in this regard. There were too many inconsistencies and inaccuracies regarding Mr. Doran's visits to the Del Taco restaurant in Mission Viejo for the Court to conclude that he in fact visited the restaurant and encountered the architectural barriers there. Accordingly, the Court enters judgment in favor of Del Taco.[2]

## II. BACKGROUND

Mr. Doran was involved in a tragic automobile accident in 1985 that left him disabled. (Complaint, p. 3.) He is a diagnosed paraplegic and has been unable to walk since the accident. (*Id.*) Currently, Mr. Doran resides in Cottonwood, California and gets around with the aid of a wheelchair and a mobility-equipped vehicle. (*Id.*)

---

[2]This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

Since his accident, Mr. Doran considers himself an advocate for the disabled. (Rep. Tr., Doran Testimony, 164:4-5.) In that capacity, Mr. Doran has filed over two-hundred disability access lawsuits in California in the last few years. (Rep. Tr., Doran Testimony, 151:9-23.) Many of these lawsuits targeted fast food restaurants, such as Del Taco. (Rep. Tr., Doran Testimony, 151:14-23.) Mr. Doran filed this lawsuit against Del Taco after allegedly visiting Del Taco restaurant #415, located at 26241 Avery Parkway in Mission Viejo, California, sometime between 1988 and 2003. (Complaint, p. 2.) Del Taco restaurant #415 is located more than five-hundred miles from Mr. Doran's residence in Cottonwood, California.

**A. Mr. Doran's Time Line of His Visits to the Del Taco Restaurant**

Mr. Doran's complaint does not provide any dates with respect to any of his alleged visits to the Del Taco restaurant. His complaint merely states that Mr. Doran visited the Del Taco restaurant. (*See* Complaint, ¶ 18.) The first details about Mr. Doran's alleged initial visits to the restaurant emerge from Mr. Doran's interrogatory responses. Del Taco specifically asked Mr. Doran to identify, by date, *every* visit he had ever made to the Del Taco restaurant. (Defendants' Request for Judicial Notice, ¶ 7, Exh. 7, p. 187.) In his interrogatory responses, dated December 17, 2004, Mr. Doran stated that he had visited the Del Taco restaurant three times in total and that those visits occurred in the Spring of 2003, June of 2003, and February of 2004. (*Id.*)

Three weeks after responding to Del Taco's interrogatories, on January 7, 2005, Mr. Doran testified at his deposition that he first visited the Del Taco restaurant in the Spring of 2002. (Doran Depo., pp. 35-36.) When asked about his

second visit to the Del Taco restaurant, Mr. Doran stated that it did not occur until July of 2004, after he had filed his complaint. (Doran Depo., p. 44.) Finally, Mr. Doran stated in his deposition that these two visits, in the Spring of 2002 and in July of 2004, were his only two visits to the Del Taco restaurant up until that time. (Doran Depo., p. 62.)

At trial, Mr. Doran testified that his first visit to the Del Taco restaurant occurred in 2002. (Rep. Tr., Doran Testimony, 121:11-12.) When asked about his second visit to the Del Taco restaurant, Mr. Doran testified that he visited the restaurant again in 2003. (Rep. Tr., Doran Testimony, 127:25-128:2.) Later, while testifying, Mr. Doran was asked approximately how many times he had visited the Del Taco restaurant. His response: "Probably close to ten times." (Rep. Tr., Doran Testimony, 129:19-21.) And, when asked how many times he had visited the Del Taco restaurant prior to the taking of his deposition, Mr. Doran testified that he had visited the restaurant "five or six times." (Rep. Tr., Doran Testimony, 129:22-25.)

Later, while still testifying on the stand during trial, Mr. Doran changed his testimony regarding his alleged visits to the restaurant. Initially, as noted above, Mr. Doran testified at trial that his first visit to the Del Taco restaurant was in 2002. (Rep. Tr., Doran Testimony, 121:11-12.) Later on, Mr. Doran testified that he first visited the Del Taco restaurant in 1988. (Rep. Tr., Doran Testimony, 167:25-168:1.)

**B. Mr. Doran's Details of His Visits to the Del Taco Restaurant**

When asked at his deposition what he ordered during his alleged visit to the Del Taco restaurant, Mr. Doran testified that he ordered an enchilada. (Doran Depo., p. 53.) Del Taco does not serve enchiladas. (Rep. Tr., Honer Testimony, 105:20-25.) Taco Bell, a main competitor of Del Taco that operates a similar fast food chain of restaurants, does sell enchiladas. (Rep. Tr., Honer Testimony, 106:1-5.)

Mr. Doran also testified at his deposition that he attempted to visit the Del Taco restaurant at issue in this case in October of 2004, only to find that it was too busy. (Doran Depo., p. 62.) Mr. Doran stated that he went to the restaurant "next door" to the Del Taco restaurant instead, which was a "Denny's." (*Id.*) Del Taco restaurant #415, the one at issue in this case, does not have a Denny's next door to it, or within four miles of it. (Rep. Tr., Albright Testimony, 22:4-7.) There is, however, a Denny's next door to Del Taco restaurant #915. (Tr. Exh. 128.) Del Taco restaurant #915, like restaurant #415, is located in Mission Viejo near the freeway. (Rep. Tr., Albright Testimony, 21:15-21.) Mr. Doran conceded at trial that he may have confused Del Taco restaurants #415 and #915: "I might have had some things confused, but I eat at Del Taco a lot. I eat lots of Del Tacos" [sic]. (Rep. Tr., Doran Testimony, 138:9-12.)

**C. The Architectural Barriers Identified by Mr. Doran**

By way of this suit, Mr. Doran seeks monetary damages, declaratory relief, and injunctive relief based on the following claims: (1) violation of the ADA; (2) violation of California's Disabled Persons Act; (3) violation of California's Unruh Act; (4) violation of California Health and Safety Code sections 19955 *et seq.*; (5) violation of California's Unfair Business Practices Act; and (6) negligence. (Complaint, p. 2.)

Mr. Doran identified some of the architectural barriers he allegedly encountered in his complaint. Of significance, Mr. Doran identified "display racks" and "vending machines" as barriers to full access of the Del Taco restaurant that he encountered during his visit. (Complaint, ¶¶ 20-21.) The Del Taco restaurant does not have any display racks or vending machines. (Rep. Tr., Albright Testimony, 9:5-9.)

Mr. Doran testified at his deposition that he encountered the following architectural barriers at the Del Taco restaurant: (1) overly steep ramp outside of the restaurant; (2) partitions near the counter where customers place their order; (3) lack of accessible seating; (4) the restroom toilet was too small and too low; (5) the toilet paper dispenser protruded out into Mr. Doran's transfer area; and (6) insufficient strike clearance on the restroom door. (Doran Depo., pp. 37-61.) Mr. Doran also testified at his deposition that the hand dryers in the restroom were too high. (Doran Depo., p. 61.) The restrooms in the Del Taco restaurant do not have hand dryers, however. (Doran Depo., p. 88.) When told of this fact, Mr. Doran was asked if his recollection about the hand dryers was related to a different restaurant that he had visited. Mr. Doran then conceded that he had in fact

confused Del Taco restaurant #415 with some other restaurant. (*Id.*) Finally, Mr. Doran testified at his deposition that these seven barriers were the *only* barriers that he encountered on his first two visits to the Del Taco restaurant. (Doran Depo., pp. 44, 62.)

Later, at trial, Mr. Doran testified that he also encountered the following architectural barriers that he failed to mention at his deposition: (1) overly steep ramp leading from the dining room to the patio area; (2) lack of International Symbol of Accessibility ("ISA") signage in the parking lot; (3) lack of ISA signage on the dining room tables; (4) condiments were placed too high and not close enough to the front of the counter; (5) front counter was too high; (6) lack of black and white tow away signage in the parking lot; (7) lack of sufficient turn space in the restroom; and (8) lack of a path of travel from the public sidewalk. (Rep. Tr., Doran Testimony, 155-156.)

**D. Del Taco's Remediation Efforts**

After Mr. Doran's complaint was filed, on October 11, 2004, Del Taco made an offer of judgment to Mr. Doran pursuant to Fed. R. Civ. P. 68. (Tr. Exh. 127.) Specifically, Del Taco offered to pay Mr. Doran $5,001, promptly remove any architectural barriers that Mr. Doran encountered at the restaurant or knew about, institute a training and compliance program for its employees, and take any other ancillary actions identified by Mr. Doran that would be necessary to address his grievances. (*Id.*) Mr. Doran did not respond to Del Taco's offer.

Although Mr. Doran did not respond to Del Taco's offer of judgment and its offer to promptly remove any architectural barriers, Del Taco still set out to remove all of the barriers identified by Mr. Doran by way of his expert Reed Settle. Stanley Albright, Del Taco's Director of Construction and Facilities, testified that Del Taco removed every barrier listed in Mr. Settle's June and September 2005 reports. Specifically, Del Taco added tow away contact information in the parking lot; installed ISA signage; installed additional disability van signage; reduced the angle of the slope on the accessible stall; relocated the paper towel dispenser; installed motion control flush valves on the toilets; wrapped the P-trap in the restroom; relocated the toilet paper dispenser; removed and relocated the toilet seat cover dispenser; replaced the sidewalk ramp so the cross slope does not exceed 2%; changed the surface slope of the sidewalk so the slope does not exceed 5%; and installed ISA signage on the sides of the leading edges of the tables in the dining room. (Rep. Tr., Albright Testimony, 28-50.) Mr. Albright testified that all of the barriers listed in Mr. Settle's June and September 2005 reports were removed and that the restaurant was in full compliance with the ADA. (Rep. Tr., Albright Testimony, 40:20-24; 50:5-15.) In addition, Del Taco posted a sign at the restaurant encouraging persons with disabilities to ask for assistance from a Del Taco employee if needed. (Tr. Exh. 106.)

## III. ANALYSIS

### A. The Americans With Disabilities Act

Historically, individuals with disabilities have been isolated from society and subjected to discrimination. *See* 42 U.S.C. § 12101(a) (2006). Despite some improvements, such isolation and discrimination continues to be a serious and pervasive social problem. *Id.* Discrimination against individuals with disabilities persists in such critical areas as employment, housing, and public accommodations. *Id.* Individuals with disabilities, unlike individuals who have experienced discrimination on the basis of race, gender, or religion, often have had no legal recourse to redress such discrimination. *Id.* This discrimination against individuals with disabilities occurs in various forms, including outright intentional exclusion, the discriminatory effects of architectural barriers, and the failure to make modifications to existing facilities. *Id.* Congress summed up the difficulties that individuals with disabilities have faced and continue to face in society:

> [I]ndividuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society.

*Id.*

Title III of the ADA is intended to make it possible for individuals with disabilities to become a part of our society. Significantly, Title III makes it possible for these individuals to move freely within our society by removing barriers in places of public accommodation, such as restaurants. *See id.*

Specifically, Title III establishes that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a) (2006).

The ADA provides remedies "to any person who is being subjected to discrimination on the basis of disability . . . or who has reasonable grounds for believing that such person is about to be subjected to discrimination." 42 U.S.C. § 12188(a) (2006). As such, the ADA "requires that a plaintiff actually be 'subjected to discrimination' or be 'about to be subjected' to it."[3] *Moreno v. G&M Oil Co.*, 88 F. Supp. 2d 1116, 1117 (C.D. Cal. 2000). A plaintiff "may not assert a 'generalized grievance' or assert the rights of third parties at sites where he has suffered no injury." *Id.*

As stated above, the important aim of the ADA, and more specifically Title III, is an America that is accessible to – and that can be enjoyed by – all Americans. With that important purpose in mind, Congress prescribed two different mechanisms for enforcing Title III. On the one hand, the Attorney General may commence a civil action if it has reasonable cause to believe that a person or group is engaging in a pattern-or-practice violation of the ADA or that discriminatory acts by a person or group present issues of general public importance. 42 U.S.C. § 12188(b). Congress also provided for a private cause of

---

[3]The Court notes that a person is not required "to engage in a futile gesture if such person has actual notice that a person or organization . . . does not intend to comply with its provisions." 42 U.S.C. § 12188(a). This point of clarification made explicit in the statute does not negate the fact that a plaintiff must suffer discrimination, or be about to suffer discrimination, in order to bring an ADA claim. "It does not eliminate the requirement of actual existing or threatened discrimination." *Moreno v. G&M Oil Co.*, 88 F. Supp. 2d 1116, 1117 (C.D. Cal. 2000).

action for injunctive relief to enforce Title III of the ADA. 42 U.S.C. § 12188(a); *see also* 42 U.S.C. § 2000a-3 (2006). That Congress provided for a private cause of action to enforce Title III is consistent with Congress' stated purpose "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *See* 42 U.S.C. § 12101(b). In short, Congress has made clear its intent to allow private persons to sue for violation of Title III of the ADA to provide for injunctive relief and to help in the enforcement of Title III.

**B. Abuse of The Americans With Disabilities Act**

Despite the important mission of the ADA, there are those individuals who would abuse its private cause of action provision by filing lawsuits solely with the intent to profit financially. This potential for abuse of the ADA has been well documented in the Central District of California and in other districts throughout the country. *See, e.g. Rodriguez v. Investco, L.L.C.*, 305 F. Supp. 2d 1278 (M.D. Fla. 2004); *Molski v. Mandarin Touch Rest.*, 347 F. Supp. 2d 860 (C.D. Cal. 2004); *Doran v. Del Taco, Inc.*, 373 F. Supp. 2d 1028 (C.D. Cal. 2005). Courts have referred to this proliferation of ADA lawsuits as a "cottage industry" and have labeled the plaintiffs who file these lawsuits "professional plaintiffs," "serial plaintiffs," and "professional pawns." *See Rodriguez*, 305 F. Supp. 2d at 1280; *see also Doran*, 373 F. Supp. 2d at 1030.

In *Molski*, the court detailed the plaintiff's history of filing hundreds of nearly identical lawsuits in federal courts throughout California and noted that the plaintiff had filed three lawsuits against three different defendants alleging identical injuries on the exact same day. 347 F. Supp. 2d 860, 861-65. The court

also noted that the plaintiff had filed thirteen separate complaints for essentially identical injuries sustained during a five day period. *Id.* at 865. In finding the plaintiff to be a vexatious litigant, the *Molski* court noted that his "shotgun litigation tactics" had undermined both the spirit and purpose of the ADA. *Id.* at 867.

In *Doran*, the court noted the way the ADA has been manipulated to generate attorney's fees. 373 F. Supp. 2d at 1030. Specifically, the court pointed out that many plaintiffs and their attorneys "have found a way to circumvent the will of Congress by seeking money damages while retaining federal jurisdiction." *Id.* This ability to profit from ADA litigation has led some law firms to send disabled individuals to as many businesses as possible in order to have them aggressively seek out all violations of the ADA. *Id.* Then, rather than informing the businesses of the violations and attempting to remedy them, lawsuits are filed and damage awards are requested. *Id.* "Faced with costly litigation and a potentially drastic judgment against them, most businesses quickly settle." *Id.*

The consequences of this abuse of the ADA are severe: businesses and insurers are harmed, the integrity of the bar is called into question, and the public's confidence in the courts is impaired. *See Molski v. Mandarin Touch Rest.*, 359 F. Supp. 2d 924, 937 (C.D. Cal. 2005) (hereinafter *Molski II*); *see also Doran*, 373 F. Supp. 2d at 1031. Most significant, however, is the adverse effect this type of abusive litigation has on disabled individuals themselves. These lawsuits denigrate the important purpose behind the ADA and create a backlash against those disabled persons who rely on the ADA as a means of achieving equal access. *See Molski II*, 359 F. Supp. 2d at 937. Indeed, businesses may become fearful of disabled patrons, thereby leading to more misunderstanding,

isolationism, and discrimination. Simply put, this litigation abuse of the ADA results in the exact harmful consequences that Congress sought to eradicate by passing the ADA. As more than one court has observed, the result of this abusive litigation is that "the means for enforcing the ADA (attorney's fees) have become more important and desirable than the end (accessibility for disabled individuals)." *Brother v. Tiger Partner, LLC.*, 331 F. Supp. 2d 1368, 1375 (M.D. Fla. 2004); *see also Doran*, 373 F. Supp. 2d at 1030.

**C. Article III Standing Requirement**

Ensuring that standing requirements are met by each plaintiff in each lawsuit brought under the ADA enables courts to ensure that the ADA is not being abused, but rather is having its intended effect of allowing disabled persons to become a part of society. To succeed on an ADA claim for injunctive relief, the plaintiff must first satisfy Article III's case or controversy requirement. U.S. CONST. art. III, § 2. "The party invoking federal jurisdiction bears the burden of establishing" standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "Each element of standing is an indispensable part of the plaintiffs case and accordingly must be supported in the same way as any other matter on which the plaintiff bears the burden, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Harris v. Del Taco*, 396 F. Supp. 2d 1107, 1111 (C.D. Cal. 2005) (internal quotations omitted), *citing Lujan*, 504 U.S. at 561.

Standing "is not measured by the intensity of the litigant's interest or the fervor of his advocacy." *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982). Rather, to establish standing a plaintiff must demonstrate (1) that he has suffered an injury in fact; (2)

that the injury is traceable to the challenged action of the defendant; and (3) that the injury can be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. Significantly, the issue of whether an individual has standing to sue is determined as of the time of the filing of the complaint. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000); *see also Harris*, 396 F. Supp. 2d at 1113 n.5. The plaintiff must establish by a preponderance of the evidence that he had standing when the complaint was filed. *See Harris*, 396 F. Supp. 2d at 1111.

In *Resnick v. Magical Cruise Co.*, the district court held that the plaintiff's review of the defendant cruise company's website was insufficient to confer standing upon him. 148 F. Supp. 2d 1298 (M.D. Fla. 2001). The *Resnick* court noted that because the plaintiff had not been on the defendant's cruise ship before filing the complaint, any attempts to bolster his standing after the complaint was filed were futile. *Id.* at 1301-02. The court also noted that although the plaintiff's expert went aboard the defendant's cruise ship as a paying cruise passenger and determined that the ship did not comply with the ADA, the expert did not board the vessel until six months *after* the plaintiff's complaint was filed. *Id.* at 1302 n.2.

Similarly, the district court in *Moyer v. Walt Disney World Co.* granted the defendant's motion for summary judgment simply because the plaintiff had not met his burden of establishing that he visited the places of public accommodation at issue before the filing of his complaint. 146 F. Supp. 2d 1249, 1253-54 (M.D. Fla. 2000). "On the date the suit was filed, Plaintiff had never visited Animal Kingdom, Pleasure Island, or Boardwalk Hotel." *Id.* at 1254; *see also Steger v. Franco, Inc.*, 228 F.3d 889, 892-93 (8th Cir. 2000) (upholding the district court's

dismissal of an action for plaintiffs' lack of standing where plaintiffs had not visited the place of public accommodation prior to filing their lawsuit).

Because standing is determined at the time of the filing of the plaintiff's suit, it is irrelevant whether the plaintiff visited a place of public accommodation numerous times *after* the filing of his or her complaint. Simply put, "any attempts to achieve or bolster standing after the suit is filed will not be effective." *Brother v. Rossmore Tampa Ltd. P'ship*, 2004 U.S. Dist. LEXIS 28524, *16 (M.D. Fla. 2004).

**D. Mr. Doran Has Not Met His Burden of Establishing Standing At the Time His Complaint Was Filed**

As noted above, Mr. Doran bears the burden of establishing that he had standing to sue Del Taco *at the time his complaint was filed.* Mr. Doran cannot meet this burden of establishing standing at the time of the filing of his complaint because there are far too many inconsistencies and inaccuracies in his own statements for the Court to conclude that he actually visited the Del Taco restaurant before he filed his complaint.[4]

Mr. Doran's testimony about his alleged visits to the restaurant first changed during the short three week period between his interrogatory responses and his deposition. In less than a month's time, Mr. Doran's version of when he first visited the Del Taco restaurant, and how many visits he had made total, had

---

[4]Because Mr. Doran did not have standing at the time of the filing of his complaint to sue for violation of the ADA, he also lacked standing to sue under his related California state law claims because they all involve his alleged visits to the Del Taco restaurant.

already changed. In his interrogatory responses, Mr. Doran stated that his first visit was in the Spring of 2003. In his deposition, he stated that his first visit was in the Spring of 2002. In his interrogatory responses, Mr. Doran stated that he had visited the Del Taco restaurant a total of three times prior to 2005. In his deposition, Mr. Doran stated that he had visited the restaurant only twice prior to 2005. In his interrogatory responses, Mr. Doran claimed that he visited the restaurant twice – both within a three month window from April to June in 2003 – prior to filing his complaint. In his deposition, Mr. Doran claimed that he visited the restaurant only once, as far back as the Spring of 2002, prior to filing his complaint.

The inconsistencies and inaccuracies did not end there. Mr. Doran's version of events changed dramatically yet again between the time of his deposition in January of 2005 and the trial of this matter in March of 2006. Now, according to Mr. Doran, he had made five or six visits to the Del Taco restaurant prior to the taking of his deposition on January 7, 2005. This is in contrast to his statement in his interrogatory responses (that he had made three visits prior to January of 2005) and his deposition testimony (that he had made only two visits prior to January of 2005). Mr. Doran's testimony at trial that he first visited the Del Taco restaurant in 2002 also is inconsistent with his interrogatory response in which he claimed to have first visited the restaurant in the Spring of 2003. Likewise, Mr. Doran's testimony at trial that his second visit to the Del Taco restaurant occurred in 2003 is inconsistent with his deposition testimony that his second visit occurred in July of 2004.

Surprisingly, the inconsistencies and inaccuracies continued. Indeed, Mr. Doran's testimony about the time line of his visits also changed dramatically during the short time he was on the stand *during* trial. Mr. Doran testified that his first visit to the Del Taco restaurant was in 2002 when asked by Del Taco's counsel. (Rep. Tr., Doran Testimony, 121:11-12.) Later on, Mr. Doran's counsel, surely detecting Mr. Doran's confusion and inconsistencies, attempted to rehabilitate his testimony:

> And by the way, [defense counsel] asked you if you were confused about some of your other lawsuits and whether or not what you were testifying about in this case was accurate. Are you sure you have been to this Del Taco?

(Rep. Tr., Doran Testimony, 167:21-24.)

When asked this question by his own counsel, Mr. Doran quickly changed his testimony. Now, he testified that he first went to the restaurant as far back as 1988. (Rep. Tr., Doran Testimony, 167:25-168:1.) What's more, Mr. Doran made his sudden about-face with conviction: "*Way* before 2002," he replied when asked by his counsel when he first visited the restaurant. (Rep. Tr., Doran Testimony, 168:1) (emphasis added). Somehow, Mr. Doran's own version of events changed again, this time during the short amount of time he was on the stand during trial. When asked by defense counsel, Mr. Doran testified that he first visited the Del Taco restaurant in 2002. A few minutes later, when asked by his own attorney in an attempt to rehabilitate his many prior inconsistencies and inaccuracies, Mr. Doran testified that he first visited the restaurant fourteen years prior, in 1988.

The inconsistencies and inaccuracies are not limited to the number and timing of Mr. Doran's alleged visits to the Del Taco restaurant. Indeed, many other inconsistencies and inaccuracies cast doubt as to whether Mr. Doran actually

visited the Del Taco restaurant before filing his complaint. First, Mr. Doran's complaint refers to objects – display racks and vending machines – which do not even exist in Del Taco restaurant #415. (*See* Complaint, ¶¶ 20-21.) Second, Mr. Doran admitted that he confused Del Taco restaurants with Taco Bell restaurants. When Mr. Doran stated that he ordered an enchilada to eat during his alleged visit, he must have been testifying about a trip to a Taco Bell restaurant since Taco Bell – and not Del Taco – serves enchiladas. (*See* Doran Depo., p. 53; Rep. Tr., Honer Testimony, 105:20-106:5.) Third, when Mr. Doran testified that he went next door to Denny's because the Del Taco restaurant was too busy, he clearly was not testifying about the restaurant at issue in this case, since it does not have a Denny's next door to it. It is likely that Mr. Doran was testifying about Del Taco restaurant #915, which, like restaurant #415, is located near the freeway in Mission Viejo. (Rep. Tr., Doran Testimony, 138:9-12.) Restaurant #915, unlike restaurant #415, has a Denny's next to it. Thus, Mr. Doran not only confused his visits to Del Taco with his visits to Taco Bell, but he also mixed up various Del Taco restaurants with one another and showed that he was uncertain about whether he had encountered architectural barriers at restaurant #415 – the one at issue in this case – or #915, the Del Taco restaurant also located in Mission Viejo near the freeway that has a Denny's next to it. Finally, Mr. Doran's own testimony reveals that he is not sure which restaurant, among all the restaurants he has visited or sued, is the restaurant at issue in this case. When describing the barriers he encountered at Del Taco restaurant #415, Mr. Doran stated that the hand dryers in the restroom were located too high. (Doran Depo., pp. 61, 88.) Because Del Taco restaurant #415 does not have hand dryers in its restrooms, it is clear that Mr. Doran was testifying about a visit to another restaurant, or place of public accommodation, when asked to identify the barriers he encountered.

The simple fact is that Mr. Doran, regardless of whether his intentions are noble, cannot keep straight all of the restaurants and other places of public accommodation that he has sued. Mr. Doran conceded as much during trial. When asked if it was difficult to keep straight the 224 lawsuits that Mr. Doran had filed in the past few years, he replied candidly: "Sometimes." (Rep. Tr., Doran Testimony, 151:9-13.) When asked if there were any fast food chains that Mr. Doran frequented that he had not sued, he replied that he had not sued Kentucky Fried Chicken. (Rep. Tr., Doran Testimony, 151:24-152:3.) In fact, Mr. Doran has sued Kentucky Fried Chicken. (Rep. Tr., Doran Testimony, 152:4-5.) When asked to try again, Mr. Doran replied that he had not sued Jack in the Box. (Rep. Tr., Doran Testimony, 152:8-10.) Although apparently unbeknownst to him, Mr. Doran has sued Jack in the Box also. (Rep. Tr., Doran Testimony, 152:11-12.)

The record before the Court is clear: Mr. Doran was, and is, confused about what restaurants he has visited and when those alleged visits occurred. His testimony in this case has changed dramatically over time. He has conceded on more than one occasion that he confused Del Taco restaurant #415 with another Del Taco restaurant, or with a Taco Bell restaurant, or with some other fast food restaurant. There simply are too many inconsistencies and inaccuracies for the Court to conclude that Mr. Doran visited Del Taco restaurant #415, which is located over 500 miles from his residence, *before* he filed his complaint.[5]

---

[5]Notably, Mr. Doran has not provided a single shred of credible evidence, such as a simple receipt, from any of his alleged pre-complaint visits. Nor, did Mr. Doran call a single witness at trial that had gone with him to the Del Taco restaurant or at least seen him there.

## IV. CONCLUSION

After considering all of the evidence presented at trial, the testimony of the witnesses, and, most importantly, Mr. Doran's own testimony, the Court cannot conclude with any degree of confidence that Mr. Doran actually visited the Del Taco restaurant before filing this lawsuit. Accordingly, judgment is entered for Del Taco.

DATED: July 5, 2006

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE